### INTER-CITY EXPRESS LINES, Inc., v. HARTFORD ACCIDENT & INDEMNITY CO.*

#### No. 16724.

Court of Appeal of Louisiana. Orleans.

Jan. 24, 1938.

Frank T. Doyle and Nicholas Masters, both of New Orleans, for appellant.

A. Dallam O'Brien, Jr., and John Pat Little, both of New Orleans, for appellee.

WESTERFIELD, Judge.

This is a suit by an employer on a fidelity bond covering an employee for $1,000, the face amount thereof, plus penalties and attorney's fees for failure to make prompt settlement of the loss as authorized by Act No. 37 of the Extra Session of 1921. The suit is defended upon the ground that plaintiff failed to give the insurer written notice or affirmative proofs of loss as required by the bond and upon the further ground that no loss has been shown to have been caused the plaintiff by reason of the dishonest act of its employee.

There was judgment below in favor of plaintiff, as prayed for, condemning the defendant to pay $1,000, with 50 per cent., or $500, as a penalty, and $250 attorney's fees. The defendant has appealed.

The plaintiff herein, the Inter-City Express Lines, Inc., a Louisiana corporation, was engaged in the business of hauling

*Rehearing refused Feb. 21, 1938; writ of certiorari denied April 4, 1938.

freight by motortruck from the city of New Orleans to points within the State of Louisiana. It operated about fifteen motortrucks. Its main office was in New Orleans, where it had two employees, Robert Basil Martin, whose integrity had been underwritten by the defendant company, and Miss Leonie Schwartz (now Mrs. McCarter). The manner in which the business was conducted appears to have been as follows: Freight consigned to plaintiff would be picked up at the shipper's door and delivered to the headquarters of plaintiff in the city of New Orleans, where it would be assorted according to its destination and loaded on trucks for transportation. It was Martin's duty to take the shippers' dray receipts and figure the amount of freight due on the shipments, make out the freight bills, which would be entered by Mrs. McCarter in a book known as the "pro-register." This entry would indicate the date of shipment, the amount due, consignees, etc. Manifests and freightbills were then made out by Martin and delivered to the drivers of the trucks, who would collect the freight, if not prepaid, and amount of the C.O.D. shipments for account of the shippers. When the trucks returned to the city of New Orleans, each driver would deliver to Martin all cash or checks received from the consignees. It was Martin's duty to deposit all collections in the bank of his employer. Mr. George Montague, the general manager of plaintiff company, became suspicious of Martin some time in August, 1934, when one of the corporation's checks was returned by the bank upon the ground that there were insufficient funds to clear it, whereupon he employed a bookkeeper or auditor by the name of Baudier for the purpose of checking Martin's accounts. Following an investigation lasting two months, Baudier reported to Montague that there was a shortage of $2,041.27. As soon as Baudier finished his audit, Martin, evidently believing that he was under suspicion, left his employment and took his books or papers with him. Upon receiving Baudier's report, Montague called at the office of Mr. Wm. H. Talbot, a member of the New Orleans Bar, who had long represented the Inter-City Express Lines, Inc., and who happened also to be the attorney for the Hartford Accident & Indemnity Company, Martin's surety. Mr. Talbot promptly communicated with Mr. Dell of Langbehn & Dell, the general agents in the city of New Orleans of the Hartford Company, giving details concerning plaintiff's claim. Mr. Talbot, Mr. Dell, and Mr. Montague met in Mr. Talbot's office several times and discussed the claim. On January 18, 1935, about two months after the matter had been brought to Mr. Talbot's attention, Dell wrote to Mr. Talbot requesting that the Inter-City Express Lines formally notify the Hartford Accident & Indemnity Company in writing. On January 21, 1935, Montague wrote the Hartford Company at its home office as requested, inclosed a copy of Baudier's report, and offered to furnish any further information that might be desired. Under date of February 2, 1935, the Hartford Company, through Dell, advised Montague that, since Martin denied the shortage, it would be necessary for them to go into greater detail, and requested that the Inter-City Express Lines take the matter up with Mr. Talbot and supply all necessary data. Under date of February 6, 1935, Dell wrote the Inter-City Express Lines acknowledging proof of loss, but stating that it was insufficient to establish the claim and suggesting further conferences with Mr. Talbot concerning the steps necessary to put the claim in proper shape for handling. About this time it was evident that there was not likelihood of a settlement of the claim, whereupon Mr. Talbot declined to represent either of his clients in the matter, and the parties respectively employed the present able counsel, who prosecute and defend this action.

We shall first consider whether there has been proof of misapplication of plaintiff's funds.

The coverage of the policy is as follows: "Within sixty (60) days after satisfactory proof thereof, such pecuniary loss as the Employer shall have sustained of money or other personal property (including money or other personal property for which the Employee is responsible) through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or wilful misapplication committed directly or in connivance with others."

Martin handled all the cash receipts, and there was discovered a shortage of $2,041.-27. Baudier, plaintiff's auditor, after some hesitation based upon the belief that it was improper for him to do more than report his findings, stated that Martin was unquestionably responsible for the missing cash.

John A. Peyroux, Jr., a certified public accountant, testifying as an expert on behalf of defendant, declared that, if

the sources of Mr. Baudier's information which formed the basis of his report were correct, the loss could be attributed to Martin alone. Baudier's report was based upon the records of the plaintiff which are not challenged as incorrect, therefore, presumably correct. Martin is shown to have appropriated money belonging to the company for his personal use upon several occasions. It is also proven that checks payable to the Inter-City Express Lines were indorsed by Martin and the proceeds put in his pocket. While the investigation was in progress or shortly afterwards, Martin abandoned his job and took his books with him and did not appear as a witness in the case, though the record indicates that he was in touch with the defendant insurance company. The evidence is more than sufficient to prove that Martin was responsible for the shortage.

We shall next consider the point raised by the defense with respect to notice. The provision of the policy, or bond, concerning notice reads as follows: "Upon the discovery by the Employer of any dishonest act on the part of any employee the Employer shall give immediate written notice thereof to the Surety at its Home Office. * * *"

█ It is first contended by defendant's counsel, though somewhat feebly, that it was plaintiff's duty to notify it when Martin was first suspicioned by Montague in August, 1934. This contention is without merit. Plaintiff was under no obligation to inform the defendant company of its suspicions but only of knowledge of fraudulent or dishonest conduct on the part of its employee which might involve the liability of the surety. American Surety Company v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977; Bank of Commerce & Trust Company v. Union Indemnity Company, 174 La. 1014, 142 So. 156.

As soon as Montague acquired definite knowledge of Martin's shortage, which was upon receipt of the report of his auditor, he communicated with Mr. Talbot, the attorney for the defendant as well as plaintiff's own attorney, and Mr. Talbot promptly notified Messrs. Langbehn and Dell, the defendant's general agents in the city of New Orleans. Several conferences between Dell, Talbot, and Montague followed with the apparent purpose of settling the claim. On January 18, 1935, Dell requested that his principal be notified direct. On January 21, 1935, Montague complied with this request.

Dell, however, had been notified by Talbot about two months prior to that time and had been discussing the matter with Montague as has been stated. There was no suggestion at any time before January 6, 1936, ten days before suit was filed, and twelve months after defendant's agent had been informed of the loss, that notice of plaintiff's claim had not been properly and promptly given. On the contrary, there was every indication that the claim was to be settled as soon as the loss was established to defendant's satisfaction.

In Wheeler v. London Guarantee & Accident Company, 180 La. 366, 156 So. 420, 422, we find the following: "If the insurer receives notice and proofs of the insured's claim after the expiration of the time stipulated in the policy for the giving of such notice and then plants its defense solely upon a ground not relating to the time for giving notice, the insured has reason to believe that the insurer intends to waive its right to defend on the ground that timely notice of the accident was not given. And in case the insured brings an action under the policy and incurs expenses incident to the suit, the insurer cannot be heard to say in its answer for the first time that timely notice was not given. The requirement in an accident policy that notice of the accident must be given the insurer within a specified time is a condition made for the benefit of the insurer. This condition may be insisted upon or waived by the insurer. If waived or if the insured is led to believe that it is waived, the insurer cannot, after suit is filed, recall the waiver by answer and insist upon a forfeiture on account of lack of notice." See, also, Cooley's Briefs on Insurance, vol. 4, p. 3518, par. (d).

█ In the case at bar actual knowledge of the claim of plaintiff was given the general agents as soon as the plaintiff had definite knowledge of the existence of Martin's shortage. Notice of the claim was given to the general agents of defendant by their local attorney on or about the 10th day of November, 1934. The claim was discussed in conferences held in the attorney's office on several occasions during a period of more than sixty days, and it was not until January 6, 1936, that it was rejected upon the ground that timely and proper notice had not been given. It is true the policy required the employer to give "immediate written notice * * * to the surety at its Home Office" and that

this was not done, but that provision of the policy, like the provision in the accident policy considered in Wheeler v. London Guarantee & Accident Company, supra, could be waived and is waived when the insured is led to believe that a notice given its surety's general agent is all that will be required. Our conclusion on this point, therefore, is that the insurer has waived the policy provision with respect to notice being sent to its home office.

The final question is that relative to penalties. Act No. 37 of the Extra Session of 1921 requires bonding companies to settle all claims for shortages, defalcation, etc., within sixty days after notice of the shortage of an employee for whom they are surety. The act requires that a notice "shall be sent by registered mail to the head office of the bond company * * * or to any duly authorized agent of said bond company in the State of Louisiana." Section 1. It also provides that, if the bond company fails to pay the amount for which it is responsible within sixty days after such notice, it shall be liable to a penalty of 3 per cent. per month, with a minimum of 12 per cent. and a maximum of 50 per cent. on the total of the loss, together with a reasonable attorney's fee, in addition to the principal amount of the bond. Section 3.

▮ The claim for penalties is resisted upon the ground that a penal statute should be strictly construed, consequently, the failure of plaintiff to give notice, by registered mail, to the head office of the company, as required by the statute, is sufficient to defeat the claim of plaintiff for penalties. It will be noted that the act requires notice, by registered mail, to be given to the head office "or to any duly authorized agent of the said bond company in the State of Louisiana." It was argued that the alternative requirement regarding notice to the authorized agent need not be in writing since the statute does not impose this condition upon the second form of notice. However this may be, we are of opinion that the notice by registered mail, being a stipulation in favor of defendant, may be waived and, in our opinion, it has been waived in this case.

In Shreveport Laundries v. Massachusetts Bonding & Indemnity Company, La. App., 142 So. 868, 874, the question of penalties authorized by this statute was considered under circumstances very similar with respect to waiver as those which obtain here. It was there held that the statutory notice was waived, as appears by the following:

"As stated, it is the detailed information which the statute required that the defendant should receive, and while the statute points out that such statement shall be forwarded to the defendant, *by registered mail,* yet, as we have already held, the defendant had a perfect right to waive that specified requirement and, in our opinion, it did so in this case when it sent its agents to the office of plaintiff company and secured the same information first hand from an inspection of plaintiff's records. This all took place more than sixty days prior to the filing of this suit.

"In view of these conclusions, we hold that defendant is estopped to complain of plaintiff's failure to furnish that notice in the particular way pointed out in the act."

▮▮ This is not a case such as that presented in Slidell Savings & Homestead Association v. Fidelity & Deposit Company, 178 La. 548, 152 So. 121, 124, where our Supreme Court held that the penalties authorized by the act of 1921 were not due because "the defense, although it has failed, was, in the language of the statute, upon just and reasonable grounds." Here the refusal to settle plaintiff's claim was unreasonable. There was every indication of a shortage in the accounts of plaintiff's employee in a greater sum than that for which the defendant was surety and there was ample opportunity for the defendant to convince itself of that fact. The maximum amount of the penalty or 50 per cent. is due since the settlement was delayed a sufficient length of time to cause the amount calculated at 3 per cent. a month to exceed that figure. We think the amount allowed by the trial judge as attorney's fees is somewhat excessive in view of the jurisprudence, and will therefore be reduced to $150. Federico Macaroni Company v. Great Western Fire Insurance Company, 173 La. 905, 139 So. 1, 79 A.L.R. 1256; Marine Bank & Trust Company et al. v. Home Insurance Company, 170 La. 193, 127 So. 598; Whiteside v. Lafayette Fire Insurance Company, 143 La. 675, 79 So. 217.

For the reasons assigned, the judgment appealed from is amended by reducing the amount of attorney's fees allowed to $150, and as thus amended is affirmed. Defendant to pay costs of both courts.

Amended and affirmed.